Appellate. Ms. Persico for Appellant Brantley, Mr. LaCard for Appellant Roe, Mr. Shoskin for Appellant Norman, and Mr. Pierce for the appellate. Good morning. Good morning, Your Honors. May it please the Court, I'm Deborah Persico. I'm here on behalf of the Appellant Kendra Brantley. I'd like to make a few points about three arguments, time permitting. First, dealing with the guilty plea. Second, with insufficient evidence of knowledge for the drug conspiracy. And third, with respect to holding Ms. Brantley accountable for the full quantity of drugs. So it's our position that Judge Chutkin's and Magistrate Judge Robinson's repeated involvement and comments during the three times Ms. Brantley tried to plead guilty ended up resulting in three things. First, the comments improperly directed future plea discussions. Second, they undermined the attorney-client relationship. And third, they so influenced Ms. Brantley by strongly suggesting that there was something wrong with the plea agreements and that there was no advantage to her pleading straight up just to get a mere acceptance of responsibility points, that she ended up giving up that beneficial plea agreement and eventually just throwing in the towel altogether and going to trial. And you know that she was influenced not only by what she did, but by what her attorney told Judge Chutkin at that third hearing. He said, to be candid with you, every time we come back before Your Honor, it appears that my client becomes a little more confused, let me just say it that way. And so our position is that the circumstances in this case are far more egregious than they were in Baker, which this Court reversed. In Baker, you had one judge, one hearing, one set of comments, and the defendant... Counsel, you have to show clear error and prejudice, right? That's a double hurdle here. Clear error. And the first two, don't we, isn't the fairest characterization of what's happening in the first two interchanges with Judge Chutkin and then with the magistrate judge, is they're just trying to understand what the facts are. What's the basis of the factual statement? No, Your Honor, because if you... But is it clear error to say that? It is clear error, because if you read the repeated comments, incorrect comments by Judge Chutkin, insisting that Ms. Brantley would have to admit that she actually knew the boxes contained marijuana, that was not correct. And the attorney, the defense counsel, continued to try to explain that to Judge Chutkin, that the plea agreement said that all she had to admit was that she knew or should have known. And that was not the problem. And in fact, the way you know that that wasn't the problem is to look at the second hearing, because at the time of the second hearing, they had revised the plea agreement based on these discussions that went over and over in the first hearing. But when they came back with the second plea agreement, it said exactly what the first plea agreement did. It said knew or should have known. So Ms. Brantley was ready to plead to that the first time around. And after further discussions prompted by Judge Chutkin, they come back for the second hearing, and again, the same language. She's ready to plead. Did she ever say she would admit to that particular element of the agreement? That she would not admit... That she knew or should have known. No. She was never addressed by any... Did she ever say that? I'm not asking how she was addressed. I'm asking did she ever say... Well, not according to the record. I'm not trial counsel, Your Honor, but according to the record, according to the record, and the defense counsel told the judge, Judge Chutkin, that her problem was she couldn't say she knew, but the plea agreement required not know. It said know or should have known. And then, of course, they get to the second hearing when Judge Robinson throws another grenade into the agreement. And again, our position is that... Is it clear error to come to the view that they just simply... What we have here is they simply weren't on the same page. They weren't agreeing. Well, they were on the same page until Judge Chutkin interrupted a private conversation with between Ms. Brantley and her attorney. They were having a discussion. Judge Chutkin just assumed that she knew what everything that they were talking about. She assumed that she knew where that discussion was going when she did not. And trial counsel... But that's not fair to her because I thought she said, I heard the defendant say, I did not. Exactly. Let me finish. Yes. She's got a duty to make sure this plea is voluntary. And if a judge hears a defendant in a Rule 11 guilty plea say, I did not, that is going to raise questions. So you are not or I'll ask you, are you taking the position that was error for her to say, wait a minute, I heard your client say, I did not, and I need to investigate that further? Well, I think what she should have said at that point is if she did hear that, she could have said, wait a minute, I just heard her say, I did not. So you need to figure this out. You need to talk to her, talk to the government, and then we'll take a recess. Let me know what you come up with. Instead, she keeps insisting that the plea agreement required Ms. Brantley to say that she actually knew. And that's where things started to get derailed. When if the judge had merely said, continue your discussion, I can't, I'll just let you know, I can't take this plea. If she's going to say she doesn't know anything, but you continue your discussion. And so finally, our position is that, and if you follow the language that the court used in Baker, it is not hard to imagine, after three at least, I mean, I believe individually and if not, in combination with all three hearings, it is not difficult to imagine this Ms. Brantley standing there, wondering to herself, is this guy standing next to me on the up and up? Because these judges keep telling me that there's something wrong with this plea agreement, that I probably shouldn't plead guilty. And finally, in the end, she decides to go to trial, which of course was not to her benefit at all. With respect to, do I have another minute? With respect to the knowledge requirement, so the government was required to prove, talking about the drug conspiracy, the government was required to prove either that she actually knew or that it should have been obvious to her that the parcels contained a controlled substance. And our position is that without any evidence of conversations, of texts, of cooperating witnesses, of cash accumulation, there is nothing about a completely sealed parcel, even if it has a fake address, and even if she accepts cash delivered in the street, there is nothing alone about the parcel that proves beyond a reasonable doubt that it should have been obvious to her that what was inside that box was drugs. What else could it have been? I'm sorry, Your Honor? What else could it have been? It could have been anything illegal. It could have been illegal stolen cell phones. It could have been child porn. It could have been iPads. It could have been any number of things that would weigh the weight that was inside that box. But the point is that there's nothing about the box itself. It certainly had to be something unlawful for somebody to be willing to pay her. Yes, but that's... To rob her to take it out of the money. Exactly, but that's not what the government has to prove. The government must prove the goal of the conspiracy was to distribute drugs. So what they had to prove is that it should have been obvious to her that what was in that box was drugs, not that it was some other illegal item. All right, we'll let you have a minute. Okay, thank you. Thank you. Mr. McLaughlin? May it please the court. On behalf of Mr. Rowe, the one issue I wanted to argue this morning was whether it was appropriate to impose the four points for organize a leader as compared to the supervisory enhancement that he recommended below. My basic theme is this. You can put a microscope on a slide and you can inflate whatever, artificially inflate whatever's on that slide. That's what happened here. The theme that everybody recognized, this was a trans, this was an internet, not internet, this was a bicoastal marijuana conspiracy. There was no evidence that Mr. Rowe was involved with the acquisition of the marijuana, in the packaging of the marijuana, or the arranging for the shipping of the marijuana. It came out of Washington, Oregon, California, Arizona. There was no evidence of him traveling out there, having any meetings out there. There was no evidence to support Judge Shukin's finding that he was the mastermind of this conspiracy. So under these circumstances, what I commend to you is this. You don't have the Didn't the PSR come to a different conclusion to that? Yes. But isn't the trial judge allowed to rely on that? Yes, but Mr. Rowe argued below to Judge Shukin that at most he was a supervisor, and he pointed out to her that there was no evidence, there just wasn't evidence, of him being involved out west. Now, I will tell you this. This is not, Judge Griffith, a case like Shaw, where you sat on and affirmed a two-point enhancement there. Nobody ever defined the large scope of the conspiracy, although the government certainly argued that that's what it was. I'm not denying to you for purposes of this argument that if you find, should you find Mr. Rowe's conviction to be valid, then you have to examine what happened here for purposes of sentencing. That's what the idea is. It's a modified real offense system. The real offense was there was a conspiracy emanating from California, but there's no evidence of him finding a conspiracy to do something smaller and local that is a subset of a conspiracy out in California. Is that not possible? Of course, Your Honor. That being the case, then, why can't he be the founder and daddy rabbit of the smaller? Well, let me give you two answers to that. The first answer is that there's no facts to support that. The second answer is to look back to the decision you wrote in Quigley where you reversed. You remanded a supervisor, actually it was a managerial enhancement. One has to look to the relative responsibility of the participants in the conspiracy. There is no evidence of him being a mastermind of doing anything, Mr. Rowe doing anything other than tracking packages as they came in. He recruited the other two defendants. I'm sorry, Your Honor? He recruited the other two defendants, did he not? Well, I think we have to assume that he did that. The evidence would support such a. That's correct. Although, as Ms. Prisco was aptly pointed out, it's unclear whether her client really knew what was in the packages. But that doesn't mean that he is the leader of the organizer of the underlying conspiracy. You know, the guidelines commentary, the courts tell us, Graham in particular from our circuit tells us that those aren't all inclusive. They're not even a full plenary summary. What one has to do, one has to analyze the facts. One has to look and see what really happened here. What really happened here is there was a conspiracy in which he was a localized member. Think of Wal-Mart, for example. If you had somebody who was a traffic manager at Wal-Mart here in Washington, D.C., would that make him a leader of Wal-Mart if Wal-Mart emanated from Bentonville, Arkansas? I think not. That whole line is just disregarding the colloquy you just had with Judge Senta. We don't need to find who's the head of the national conspiracy here. There was a local conspiracy. The theory is that there's a local conspiracy here. And the pre-sentence report says there's evidence that he directed people in that conspiracy. At a very microcosmic level, Your Honor, not at a macro level, there's no evidence of him organizing. She called him the mastermind. There just simply isn't any evidence of that in the record. So is it your argument that we need to be looking at him being the mastermind of the national conspiracy in order to use this enhancement? No. Let me tell you what I'm arguing. I'm arguing what you should do what the court said to do in Graham. You try to figure out an organizational chart of a conspiracy, and then you superimpose everybody's responsibility. And if you do that, if you look at what Mr. Roe was as compared to the members, known and unknown, of this conspiracy, you would agree, I respectfully suggest, that he is nothing more than a supervisor. Your Honor, did you have a question? One very, very small one. I knew you were coming. Your colleague has the pronunciation of the district judge correct. Chetkin is the district judge. As your colleague stated, the district judge is Chetkin, not Shookin, or whatever you said. I apologize. Okay. I just wanted to make sure you were clear. But I also want to make it clear. You might run into her and call her by the wrong name. Thank you for correcting me, Your Honor. It's always a pleasure to be up here. Mr. Soshin. Please support Charles Soshin on behalf of Alicia Norman. In this case, Your Honors, my client was on trial for two things, a drug trafficking conspiracy and a bribery count. She was, unlike the other two co-appellants, acquitted of the drug trafficking charge by the jury. She was convicted of the bribery count. At sentencing, in determining her sentencing guidelines, the trial court looked to the bribery guideline, which then directs you to look to the guideline of the underlying offense, which in this case presumably was drug trafficking. She was then sentenced under the drug trafficking guideline, giving her a base level offense of 24 rather than 14, had it been done under the bribery statute. I submit that that is proper. However, you can look to relevant conduct and you can look to the underlying offense if and only if there's a preponderance of the evidence that that crime was committed. I submit that there was not a preponderance of the evidence. The jury found that the government did not prove beyond a reasonable doubt. Presumably, the jury did not see evidence of drug trafficking for the reasons Ms. Brantley's counsel mentioned. The package was never opened. There's no evidence that my client was ever told what was in the package or discovered what was in the package or had any reason that she should have known what was in that package. In addition, my client's involvement was limited to a single transaction on a single day. This wasn't an ongoing thing for my client. The trial judge made some comments. Well, it looked like she knew what she was doing. You know, she had done this before. Those are just assumptions made by the trial judge, not premised on any direct evidence in this case. There were no statements. There were no recorded phone calls showing that my client had any idea what was in that package. I proffer that she didn't even have any evidence that there was something illegal in the package. She was a ladder technician. She covered routes for other mailmen when they were unavailable, either on vacation or sick. This wasn't her normal route. She was told to deliver a package to someone. She delivered the package. They gave her cash. She counted the cash. Pause right there. That doesn't alert her that something amiss is going on? It certainly would alert her that something out of the ordinary is going on. She's just committed a crime. That's bribery, right? She's taking money for an official act. I'd argue that there's no evidence that she knew it was a crime. I can't read her mind. It's an unusual thing to accept money for a package. As a government employee, you accept money for a package. That doesn't put her on notice? I don't think in and of itself it does, Your Honor. I think it raises a red flag. There's no way around that. That's what I'm saying, raises a red flag. To make that equate to a preponderance of the evidence that she was in a drug trafficking conspiracy on a single transaction, she received a small amount of cash for a package. I say that's not preponderance of the evidence. It's de minimis evidence at most. She has no affirmative duty. How about the fact that she was living with an unindicted co-conspirator? Isn't that another feature that Judge Chutkan? That's certainly another de minimis piece of circumstantial evidence. There's nothing in the record of any communications between them. Certainly knowing a member of a conspiracy does not make you a member of a conspiracy unless you formed an agreement to commit a crime. She had no affirmative duty to learn what was in the package. In fact, it's a mailman's duty not to investigate contents of a package. But when it's part of a criminal activity, isn't there some duty that a postal employee has to question what's going on here? Why am I being asked to be involved in a crime? You don't think that raises it? This argument that a postal worker is not allowed to open a package just doesn't work when it's clear they're involved in a crime. I'd argue that could be the case if it was more than one time. This was one time. You get one crime. So that's the rule. One crime you get. How many crimes before you have to look? Well, if you look at this, it was one transaction. Counsel, how many crimes before you have to look? You said one doesn't do it. How many crimes do you have to look? In this situation, she had knowledge. How many? One's not enough. So how many crimes does a postal employee have to commit before you would have them look? One crime, Your Honor, but my argument was that this wasn't a crime because she didn't have the necessary intent because she lacked the knowledge of what was in the package. This was a single time. Maybe driving off.  So how many red flags before you have to look? I think the red flag was raised after this transaction, but there were no subsequent transactions. Okay. I'd argue there was no conspiracy on her end. There's just nothing in the record that she should have known the package contained marijuana. As my co-counsel mentioned, it could have contained anything. It could have been illegal cigarettes. It could have been an embarrassing item that someone didn't want to discover that wasn't even illegal. So I'd submit that she was sentenced under the wrong guideline. I'd also real briefly proffer that the court erred in giving the deliberate and willful ignorance instruction for the reasons I just mentioned. I don't think the evidence shows that she was deliberately ignorant. She didn't know until after she got that money and driving away that something was unusual. Should she have been more diligent? Yes. But does that lack of diligence mean she entered into a conspiracy in this case and that there's a preponderance of the evidence that she was drug trafficking? I'd submit that it does not. And then related to those two arguments, I'd submit that the government also failed to prove beyond a reasonable that she acted corruptly, which is required in the bribery statute. For the same reasons, a single transaction on a single day on a route she wasn't familiar with following directions from her superior does not mean she was acting corruptly as required under the bribery statute. All right. Thank you. Mr. Pierce. Let me ask you just off the bat. It may not be a crime and it may be a misdemeanor, but you can't give somebody's mail to someone else. That's correct, Your Honor. I mean, I know that. And one of the pieces of evidence below was the oath that postal workers take upon joining and sort of built into that is that you don't open people's mail and you don't misdeliver people's mail, which, of course, there was ample evidence that the defendants here, particularly Roe, excuse me, Brantley and Norman, did. Well, since we started, yeah, could you address the argument that your friend made about Norman and her using a preponderance of the evidence standard here to say that she knew what was going on? Certainly, Your Honor. And I don't understand my friend to argue that using acquitted conduct is problematic. Well, I want to get to that in a second. But first of all, just his preponderance of the evidence. Fair enough, Your Honor. So there was more than — first of all, my friend on the other side conceded there were red flags. I think once you've got a red flag, you've hit the preponderance standard there in and of itself. And those flags were, for example — The red flag as to what? As to that there was marijuana in there? Yes, Your Honor. Why? What's the evidence of that? I think, as Judge Sentelle indicated, first of all, there's just a matter of common sense. If you're engaged in a transaction on the street where you pull up, you deliver packages, and you get cash in return — Right, right. But we're talking about there was marijuana there as opposed to other contraband. Right. My point is simply that there's a common sense inference, as the government argued below. Beyond that, there was expert testimony to suggest the kinds of packages at issue here had all these indicia of drug trafficking. And she would know that? Certainly she would know that. I mean, she is a — whether she's a letter technician or a postal carrier, she would have the regular experience of delivering packages to know that when something comes with lots of packaging, when there are misdirected addresses, when there are false return addresses, when there are a whole bunch of names for different routes or addresses, that that would get you past that preponderance of an evidence standard. No question as to — perhaps it would — as to that something illegal is taking place here. But how do you get to that it's drugs? You're just saying — why? Why drugs as opposed to some other contraband? Well, precisely the reasons I just set out. You know, first of all, that is the common sense inference. But beyond that, you had testimony in the record, and as Your Honor pointed out, information from the PSR. I'm sorry. Maybe I don't know common sense. Why is that the common sense inference? I understand it's common sense inference that something illegal is happening here, but that it's involving drugs. That's what I'm missing. And maybe you said it, and I just didn't hear it. No, I just think it is the nature of an on-the-street transaction, a hand-to-hand. And I acknowledge that if that were the only evidence that we had here, that would be somewhat thin. But when seen against the other evidence at trial and before the Senate here, we're talking about a sentencing issue. But is that evidence linked to Norm? Yes. How? Well, the evidence that she is delivering packages that an expert has already testified have indicia of drug trafficking. And then there's the additional piece of evidence that Judge Henderson referred to, which the district court found and was unobjected to, which is that she had a child with Derek Hawkins, who himself was an unindicted co-conspirator, who had been seen on video divvying up marijuana in the back of a postal truck. In other words, engaged in precisely the same — He wasn't on that video, though, was he? That's correct. She was not. But, again, we're on a preponderance of the evidence standard here and sort of built on top of that a clearly erroneous factual finding. And so I think building those two together, we get past that standard such that you can apply the cross-reference appropriately. Okay. Let's get to the larger issue of use of acquittal conduct to find a preponderance of the evidence. So, again, I don't understand my friend on the other side to argue that, but nonetheless — You've been asking about that. Sure. And this Court, since the Boney decision in 1992, has taken that approach. The Supreme Court resolved the circuit split in the Watts case. And then Judge Kavanaugh said in — then-Judge Kavanaugh in 2008, in settles, acknowledged some discomfort with this, but said the proper avenue for that is the sentencing commission or Congress, that it's not for the court — As a matter of first principles, what is your view of it? I mean, I think that there — I acknowledge also some discomfort with that, but I think within the larger sentencing scheme where courts have before them a wide array of information that they may properly consider, I think that that is — falls within that idea that a sentencing judge should take into account, essentially, all the information available to him or her. But, you know, again, as Judge Kavanaugh acknowledged, there is some discomfort if a jury makes a finding beyond a reasonable doubt that conduct — that someone didn't commit a crime, that that may still count against the defendant. But that's a different standard. Now, unless the Court would like to go elsewhere, I'll just go through the arguments that, as they were presented — Why don't you go to the Rule 11? Certainly, Your Honor. So the language and advisory committee notes of Rule 11 distinguish between, on the one hand, a prohibition on judicial participation in negotiations that lead to, that is, culminate in, a plea agreement, and on the other hand, an active role for the Court to evaluate a plea agreement that has been presented to the judge. Now, that distinction undermines Brantley's argument for two reasons. First of all, unlike the cases on which Ms. Brantley relies, and I'm thinking of the Baker case, Braxton and Sonia out of the Fourth Circuit, ultimately, of course, there was no plea agreement reached here. And I think that's also relevant. Judge Griffith, you talked earlier about the plain error review. I think that's also relevant to the prejudice inquiry. But second, and I think even more damning for Ms. Brantley's argument, is that what Judge Chupkin was doing below and Judge Robinson fell squarely within the ambit of Rule 11 duties. On day one — I think it's easiest to say day one, day two, and day three — on day one, there's a breakdown over the factual basis, as Judge Henderson indicated. When a district court judge hears a defendant saying, I didn't do that, that judge is beholden under Rule 11 to ensure that there is — either that the plea is voluntary or that there's a factual basis supporting it. On day two, before Judge Robinson, the Court there is simply going through the standards about the relinquishment of rights, and they get hung up on a collateral right issue. Rule 11b-1 says that a collateral right is something the Court must review, and that's where the plea negotiations break down. On day three, I think it's a little bit of a more challenging situation. There is a plea agreement before the Court, so the Court still has that obligation to be actively involved, although, admittedly, defense counsel early on indicates an impasse and suggests for the first time that the party — that Ms. Brantley intends to enter a guilty plea as to counts one and three, the bribery-related counts, but to go to trial as to count five. What Judge Chutkan then does is not engage in plea negotiations, but facing a highly unusual situation, tries to understand precisely what the defendant is requesting and making sure that the defendant understands to the extent possible the potential consequences of what she's asking for. And at the end of the day, you know, because she goes — Ms. Brantley goes to trial, I think that there is no prejudice, and particularly when we're reviewing this upon a plain-error standard, finding that Judge Chutkan had to have clearly erred below. Now, moving to the knowledge challenge that Ms. Brantley also advances in this Court. The argument as to Ms. Brantley is stronger, certainly, than as to Ms. Norman. She made multiple deliveries of packages, which — 19 in all. And again, the same indicia of drug trafficking that the expert witness testified to was available to the jury. She was, you know, in active communication with Roe, who was tracking these packages that came into the LeMond Riggs postal area, and put all of these together, established that she knew that what she was dealing with were drugs. In addition, she had a child with Mr. Roe. Again, in this Court, viewing the evidence in the light most favorable to the jury's verdict should uphold that conviction. Now, turning to the 3B1.1 enhancement, the district court correctly applied that here, a finding to which this Court owes deference. What the Court found, based on the evidence at trial and the materials in the PSR, is that Roe was the mastermind. He was directing others to deliver packages. He had recruited other individuals, you know, not only other defendants, but additionally people who were pulling — I think it's Chabrone and Zanders who were pulling packages out of the mail stream. He profited in a way that the others didn't. The others, the evidence showed, basically got cash through these bribery exchanges. He, by contrast, had tens of thousands, and then extending it further into 2013, 2014, hundreds of thousands of dollars. Now, I understand my friend on the other side to say, well, listen, this is sort of an inappropriately narrow focus. But there are two responses as to that, and I think the Court flagged both of them. One is, under the plain language of the guideline, there need not be a single leader. Even assuming a bi-coastal conspiracy, Roe is leading the more localized conspiracy in — Other than being Wal-Mart, that this might be McDonald's, and he's the local franchisee. I think that's precisely right, Judge Sentell, and so I think that that, again, on either a due deference — there's been some disagreement in this Court's case law, it's either a due deference or a clear error standard. Either of those, there is more than sufficient evidence to uphold the District Court's confident — it used that word — finding that Roe was a leader or organizer warranting the four-point enhancement. I know we've addressed the Norman issue, the issues that my friend raised as to Ms. Norman. Briefly, as to the Corruptly point, I think that confuses, as we mentioned in our brief, the standard for bribery and the standard for the drug trafficking conspiracy of which Ms. Norman was ultimately acquitted. She was acquitted, but it really was used against her in the sentencing, was it not? Or am I misreading this? It was, and I think that goes back to some of our colloquy earlier about using the preponderance standard and holding — It does, but it may go a little further than that. In the case of her co-defendant, Ms. Brantley, you had many instances of packages being pulled out of the mail and handled in the unusual fashion, which may well suggest a drug trade going on, because there's not much else in the way of illegal things would be handled that way. But if it's only one package, is that enough to suggest that she knows that it's a drug being involved? So, yes, I think — yes is the answer. But just to be clear, it wasn't just one package. It was one instance that was caught on film, which included three packages when she made that delivery. But I think that gets back to Judge Griffith's question, which is, you know, how many times do you need to be on notice that engaging in a misdirected mail delivery — Well, I would say there's a different question could be asked in that case as to whether, if there were just one instance, I understand you're counting it as three, but if there were counting it as just one package, is there anything there that does strongly suggest that it's drugs as opposed to something else illegal? And just to be clear, are you talking about in the hypothetical situation, Your Honor? Let's talk hypothetically for a moment then. Okay. Again, I think a lot of this would turn on the case-specific facts. If it were a single delivery and there were not some of the other indicia that there are as to Ms. Norman, for example, that she has a relationship with an unindicted co-conspirator, that she was a floater who subbed in for Ms. Brantley, and therefore the jury could properly infer and certainly the district court judge find by a preponderance that she was knowledgeable as to the full scope of the conspiracy, I acknowledge that would be a much harder case for us. But, again, those aren't the facts before this Court. I'd like to go back to the Rule 11 and the third hearing. Judge Chutkan, pretty much, she did not reject a plea, but she said, I've never heard of this before, I've checked with other judges, I don't know that you can plead guilty to the two counts and go to trial on the third, and spends a lot of time going back and forth. And imagine a defendant thinking, I don't know that I want to do this, or I don't know that I can do this, I don't know, I mean, is there any case that you can think of that allows a trial judge, if she had accepted the guilty plea, I think it would be pretty tough, and then she'd gone ahead and been, say, acquitted of the third charge, to say that that guilty plea was intelligently given. Now, she let her decide, let Ms. Brantley decide, no, I'm not going to plead guilty. But that was a very unusual hearing, to say, I'm not sure you can do this. What you want to do, I'm not sure you can do it. And you talk with your lawyer, and then she says, I'm not going to do it. So to answer one of the questions built into that, I'm not aware of a similar case, but I think that speaks to precisely what Your Honor has indicated, that this was a very unusual situation. And I think what Judge Chutkan was trying to do was, when the defense counsel had said, I think we're at an impasse, Judge Chutkan a number of times basically said, I'm not going to get involved with this. I acknowledge that the, and can I continue answering the question, that perhaps the initial response of, I'm not sure that there's authority, or I will need authority for you entering a guilty plea as to one count, or as to two counts, and going to trial as to one, that may not have been the best initial reaction. But what Judge Chutkan then does is take a recess herself, consult some other judges in this courthouse, look at some case law and come back and say, listen, if this is what you want to do, you can go forward and do this. I'm not going to advise you as to this. That's an issue as to your defense counsel. Again. But she never said, you know, that's a perfectly proper thing for you to do. I mean, a valid legal thing for you to do. You can plead to these two counts and go to trial on the third. She never said that. I think she does say that. I agree that her initial reaction is reluctance and saying I'll need some authority. But I believe, and obviously the record will bear it out one way or the other, that at the end she says, I will accept whatever the parties agree on. And I think implicit in that is if the parties agree on guilty plea as to one count, or excuse me, as to two counts and trial as to the third, then that's what she would have accepted. Ultimately, Ms. Brantley doesn't accept that. And, again, we're on plain error standard. So a clearly erroneous finding in this highly unusual situation and flux I think wouldn't be appropriate here. All right. Thank you. Does anyone have a comment? All right. Ms. Firsico, why don't you take a minute? Thank you, Your Honor. Judge Henderson, I would submit that with respect to the third hearing, not only was what you mentioned the problem, but even more egregious than that was the way Judge Chutkin repeatedly questioned, and we've set this forth in detail in the briefs, repeatedly questioned what's the advantage of the acceptance of responsibility. I just don't see what the advantage of pleading guilty straight is. It's over and over and over again. And then on top of that, when Ms. Brantley kept saying, well, I want to plead to these two counts and go to trial on the other one, then this other long dissertation goes on about how, well, you know, your co-defendants are going to trial. They don't want to plead guilty. And you're going to be sitting there forever anyway with the jury because you're still going to have to go on the drug conspiracy charge. All of these comments, the repeated involvement in this attempt to plead guilty, was highly improper and definitely requires reversal. And the only other point that I'd like to make with respect to this knowledge issue, if you look at Gaskins, Gaskins is exactly on point with what we are arguing here. In Gaskins, on page 578, it says, even if Gaskins did not think Miller's activities were on the up and up, there was no evidence that he thought they involved the object of the conspiracy for which he was convicted. And that is our point, that there is no evidence in this case, no conversations, no text, no confidential informants, no cash wealth, nothing except a completely sealed box that would have tipped them off that there were drugs inside. All right, thank you very much. I have two very brief points. I'm going to refer you, Judge Sintel, to your decision of Quigley. Relative responsibility for the conspiracy. It's not just, it's not a conspiracy, a small conspiracy in Washington, D.C. It's a conspiracy that spans the entire coast in which he is, for lack of a better term, a cog in a machine. Not an insignificant cog in a machine, a supervisor. Judge Griffith, I was in this courtroom arguing before you and Judge Kavanaugh on the issue of acquitted conduct several years ago. It's long past time for this Court to send a message to the Supreme Court about discomfiture, about the use of acquitted conduct in sentencing. You think this Court sits for the purpose of sending messages to the Supreme Court? To send its own message. I don't recall that in our job description, Judge. The use of acquitted conduct in sentencing, Judge Sintel, is reprehensible to the Constitution. I think it's reprehensible. It's not my job. A gentle suggestion. It's not my job to impose or even tell the Supreme Court that they should impose things based on my sense of reprehensibility. Could I ask you to do this, send a gentle message to the Supreme Court, if you feel discomforted by it. If you don't, say it. I think I pretty much just said I'm greatly discomfited by it, but we're way down that road. Thank you. Thank you. Richard Sochin. Just to expand upon the acquitted conduct argument, I do think it's poor public policy that in this day and age, where we're trying to empower communities, give juries the power to make decisions, to ignore a jury's finding and then use that against the defendant as a sentence, that doesn't do a lot to maintain the public's confidence in the judicial system. And I can tell this Court that in United States v. Jones, three Supreme Court justices did vote for certiorari on that issue. Scalia, Thomas, and Ruth Bader Ginsburg all wanted to hear that issue on the Supreme Court. Thank you. All right. Counsel, you were either appointed by us or you are appearing pro bono, and we thank you for your very able assistance.
judges: Henderson, Griffith, Sentelle